**In re: COMMERCIAL FINANCIAL SERVICES, INC., and CF/SPC NGU, Inc., Debtors.**

**Nos. 98–05162–R, 98–05166–R.**

United States Bankruptcy Court, N.D. Oklahoma.

Feb. 18, 2000.

Larry M. Wolfson, Jenner & Block, Chicago, IL, Neal Tomlins, Tomlins & Goins, Tulsa, OK, Jay Geller, Law Offices of Jay Geller, Chicago, IL, for Debtors.

Thomas Rice, Simpson Thacher & Bartlett, New York City, James Kincaid, Crowe & Dunlevy, Tulsa, OK, Michael Gibbens, Crowe & Dunlevy, Tulsa, OK, for Chase Securities.

Marc Kieselstein, Sachnoff & Weaver, Ltd., Chicago, IL, for Aegon Group and other interested parties.

Jack Stern, Barrett Gravante Carpinello & Stern LLP, New York City, Bradley K. Beasley, Boesche, McDermott & Eskridge, L.L.P., Tulsa, OK, for Bank of Austria AG and Bank of Scotland.

Kenneth Schacter, Richards & O'Neil, LLP, New York City, Carol Wood English, English & Wood, P.C., Tulsa, OK, for Alliance Capital Management.

Max Naegler, Tulsa, OK, Lucinda O. McConathy, Richards Spears Kibbe & Orbe, Washington, D.C., for Abbey Group and other interested parties.

### ORDER GRANTING IN PART CFS'S MOTION FOR PROTECTIVE ORDER

DANA L. RASURE, Bankruptcy Judge.

**Procedural History**

On November 10, 1999, Commercial Financial Services, Inc. ("CFS"), filed Commercial Financial Services, Inc.'s Motion for Entry of Protective Order No. 2 Governing Limited Waiver of Privileges and Notice of Opportunity for Hearing (Docket # 1608) ("Motion" or "Motion for Protective Order"), to which is attached Protective Order No. 2 Governing Limited Waiver of Privileges by Commercial Financial Services, Inc. (the "Proposed Protective Order"). In response to the Motion for Protective Order, the following pleadings were filed on November 30, 1999:

- Memorandum of Chase Securities, Inc. in Opposition to the Motion of Commercial Financial Services, Inc. for Entry of Protective Order No. 2 Governing Limited Waiver of Privileges (Docket # 1680);
- Response by Certain Interested Parties to Commercial Financial Services, Inc.'s Motion for Entry of Protective Order No. 2 and Motion to Compel Compliance with This Court's Global Rule 2004 Discovery Order (Docket # 1681);
- Joinder of Bank of Austria AG and Bank of Scotland in Motion to Compel Compliance with the Rule 2004 Discovery Order (Docket # 1683);
- Joinder of AEGON USA Investment Management, Inc. and Other Interested Parties in Response Filed by Certain Interested Parties to the Debtor's Motion for Entry of Protective Order No. 2 and Motion to Compel Compliance with Global 2004 Order (Docket # 1682); and
- Response and Joinder by Alliance Capital Management L.P. With the Response by Certain Interested Parties to Commercial Financial Services, Inc.'s Motion for Entry of Protective Order No. 2 (Docket # 1690).

A hearing on the matter was set for December 7, 1999, at which time the parties requested that the Court allow further briefing of the issues raised in the objections. The Court permitted further briefs and continued the hearing to January 25, 2000. On December 23, 1999, CFS filed its Response to Objections to Protective Order No. 2 Governing Limited Waiver of Privileges (Docket # 1797) ("CFS's Response"). On January 7, 2000, the objecting parties filed the following:

- Sur–Reply of Chase Securities, Inc. to Commercial Financial Services, Inc.'s Response to Objections to Protective

Order No. 2 Governing Limited Waiver of Privileges (Docket # 1833);

- Reply of Certain Interested Parties in Support of Objection to Protective Order No. 2 Governing Limited Waiver of Privileges (Aegon USA Investment Management, Inc., BlackRock Financial Management, Inc., ING Investment Management, LLC, KRE Reinsurance, Ltd. and Miller Anderson & Sherrer LLP)("Aegon Group") (Docket # 1831);

- Memorandum Regarding CFS's Response to Objections to Protective Order No. 2 Governing Limited Waiver of Privileges (Abbey National Treasury Services plc, American International Group, Inc., Cerberus Partners L.P., and Tri-links Investment Trust) ("Abbey Group") (Docket # 1836); and

- Reply of Alliance Capital Management LP to CFS's Response to Objections to Protective Order No. 2 (Docket # 1837).

A hearing was held on January 25, 2000, at which CFS appeared though its president, Fred Caruso, and through its counsel, Larry Wolfson, Jay Geller, Robert Stauffer, and Neal Tomlins; Chase Securities, Inc. ("Chase") appeared through its counsel, Thomas Rice, James Kincaid and Michael Gibbens; the Aegon Group appeared through its counsel, Marc Kieselstein; and Alliance Capital Management LP ("Alliance") appeared through its counsel, Kenneth Schacter. Mr. Caruso, CFS's president and sole director, testified in support of the Motion. At the request of the Court, CFS provided the Court with a copy of the (1) Request for Production of Documents dated December 10, 1999, made pursuant to the Rule 2004 Order and initiated by Bankers Trust as Trustee, and (2) the Official Committee of Asset–Backed Securityholders' Supplemental Interrogatories dated December 3, 1999 (the "Discovery Requests"). The Court has reviewed the Discovery Requests.

Upon consideration of the pleadings, the testimony, the Discovery Requests, the arguments of counsel, the posture of the case (of which the Court takes judicial notice), and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. § 1334; 28 U.S.C. § 157(a), (b)(2)(A) and (O); and Miscellaneous Order No.128 of the United States District Court for the Northern District of Oklahoma: Order of Referral of Bankruptcy Cases, effective July 10, 1984, as amended.

 Some of the objecting parties have argued that CFS is seeking an advisory opinion as to the validity of privileges asserted as to documents that have not yet been identified, and that the Court cannot issue advisory opinions.[1] The Court finds that CFS *does not* request a ruling on whether any document it proposes to pro-

---

1. The Aegon Group, for instance, cites *In re Wright*, 220 B.R. 543 (S.D.N.Y.1998), for the proposition that a court cannot issue an advisory opinion as to the legal effect of future disclosures in a context where the disclosure has not yet been made and no privilege has yet been asserted as to any particular information. *Wright* is distinguishable from this case. The debtor in *Wright* declined to file schedules or be examined without a protective order because he feared that these disclosures would waive his Fifth Amendment right against self-incrimination, which he did not want to do because an FBI investigation of his prepetition conduct was likely. The bankruptcy court described the debtor's application as "seeking immunity under the guise of a protective order." *Id.* at 544. In *Wright*, the court had no idea what would be disclosed and whether the disclosure would or would not constitute a waiver of Fifth Amendment rights that might subject the debtor to criminal prosecution. In this case, however, the subject matters of the disclosures CFS proposes are clearly described on Exhibit A to the Proposed Protective Order, and the undisclosed privileged information is intelligibly categorized. In addition, undisclosed privileged documents will be listed on a privilege log and will be subject to challenge. Also, governmental entities and investigative bodies have been given notice of CFS's Motion and have expressed no objection to the entry of the Proposed Protective Order. The concerns

duce or withhold is actually privileged. CFS seeks permission to make an offer to interested parties to disclose certain information that would otherwise be withheld as privileged on the condition that those interested parties agree to give up the right to assert subject matter waiver as to documents CFS does not desire to disclose. In order to further safeguard the undisclosed documents from parties who decline to give up their right to assert subject matter waiver, CFS requests that the Court make findings of fact and legal conclusions supporting the limitations on waiver that would be binding on non-consenting parties. The Court finds that a live controversy exists because discovery has been propounded upon CFS, that the discovery seeks potentially privileged information,[2] that CFS believes that it is in the best interests of the estate to disclose certain privileged information but only if such disclosure does not compel CFS to disclose other privileged information, and that CFS is delaying compliance with the Discovery Requests pending the Court's consideration of its Motion for Protective Order. This controversy must be resolved before discovery may proceed.

**Findings of Fact**

### 1. Notice

The Court finds that notice of the Motion and the hearing was adequate under the circumstances, and all other notice is waived.

### 2. The Objecting Parties

The objecting parties are involved in securities fraud litigation that was commenced in the United States District Court of the Northern District of Oklahoma (the "District Court Litigation").[3] All objecting parties except Chase are plaintiffs in the District Court Litigation. These plaintiffs are holders of asset-backed securities that were acquired through complex securitization transactions that were initiated by and inured to the benefit of CFS. Chase is a defendant in the District Court Litigation[4] and Chase alleges a contingent claim against the estate for indemnification in connection with its involvement in the District Court Litigation. CFS is not a defendant in the District Court Litigation because of its status as a chapter 11 debtor. CFS possesses and wishes to release information that is relevant to a meaningful evaluation of the strengths and weaknesses of creditors' prepetition claims against CFS and the estate. Some or all of this information is also relevant to the claims alleged by the plaintiffs against Chase and others in the District Court Litigation.

Neither the Official Committee of Unsecured Creditors nor the Official Committee of Asset–Backed Securityholders oppose the Motion for Protective Order.

### 3. The Discovery Requests

Pursuant to the Order Authorizing and Establishing Procedures for Discovery Pursuant to Rule 2004 entered in this case on October 1, 1999 (the "Rule 2004 Order"), the Discovery Requests were served upon CFS. The Discovery Requests seek, among other things—

> discovery of documents or information [interpreted broadly to include, among

---

expressed in *Wright* about giving blind and blanket protection from criminal prosecution do not arise in this case.

**2.** For example, the Request for Production of Documents served upon Mr. Caruso, as president of CFS, includes requests for "[a]ll documents evidencing communications between CFS and [its prepetition counsel] Mayer, Brown & Platt for the period of January 1, 1995 to the present" (Request # 79), and "[a]ll documents concerning any report, analysis or investigation prepared or conducted

by Jenner & Block relating to CFS, including communications between any person or entity relating to such report, ... and any work papers and supporting materials." (Request # 57).

**3.** It has been stated that eleven separate complaints were filed in late October and early November 1999.

**4.** Chase states that it is a defendant in only two of these cases.

other things, information stored on paper, tapes, computer disks and other electronically stored data] that (a) contain or reflect the work product of Mayer, Brown & Platt, Jenner & Block or CFS's in-house counsel, or (b) reflect communications between CFS (including its in-house counsel) and Mayer, Brown & Platt or Jenner & Block, or (c) reflect communications between CFS officers, directors and/or employees and CFS in-house counsel, which documents and information are protected by the attorney-client privilege, the work-product immunity, and/or other statutory and common law privileges.

Motion for Protective Order at p. 3, ¶ 9.

CFS has responded to the Discovery Requests and desires to make unprivileged documents and *certain* privileged documents available for review in the CFS Depository, but only upon the entry of a protective order. The estate has over 8,000 bankers' boxes of documents and 8,500 magnetic tapes of information. In the absence of a protective order, CFS is justifiably unwilling to determine whether to waive privileges in any particular documents until all have been reviewed. Such a review would result in a significant delay in the administration of the estate and would be extremely costly to the estate. In response to prior limited discovery, CFS reviewed and made available to the

parties eighty bankers' boxes of documents which are presently located in the IKON Depository—a time consuming and expensive task. CFS would prefer to comply with the Discovery Requests in a more expeditious manner. Mr. Caruso, as president of CFS, testified that expedient disclosure of all information relevant to creditors' claims is crucial to meaningful plan negotiations, and therefore is in the best interests of the estate. Mr. Caruso also desires to minimize the enormous expense that would be incurred if *all* documents and tapes had to be culled for privileged information before he could determine whether to waive privileges as to certain matters.

### 4. The Proposed Protective Order

By virtue of the Proposed Protective Order, CFS seeks to disclose as much information as possible, including *certain* privileged information, while minimizing the cost and delay that would occur in the ordinary course of responding to the Document Requests. Upon the entry of an appropriate protective order, CFS is willing to waive its attorney-client privilege and disclose to interested parties certain privileged information [5] to the extent that such documents were in existence or relate to events that occurred prior to October 15, 1998,[6] so long as such waiver does not affect CFS's right to assert its privileges as to other matters, or as to the same

---

**5.** The privileged information CFS intends to disclose if a protective order is entered is defined in Exhibit A to the Proposed Protective Order as documents (1) created or related to the period prior to October 15, 1998; *and* (2) containing work product of Mayer, Brown & Platt; Doerner, Saunders, Daniel & Anderson, L.L.P.; Crowe & Dunlevy; Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.; or in-house counsel; or communications between CFS and one of these law firms or in-house counsel; or between such firms; or between employees and in-house counsel; *and* (3) relating to contemporaneous legal advice (but not litigation advice) concerning termination of employment of and severance payments to Mitchell Vernick, Michael Temple, Charles Welsh, or James Woolsey, or certain matters classified by Mayer, Brown & Platt's files, including but not limited to the

various securitization transactions, a proposed initial public offering, the warehouse lending facilities, certain employment agreements, the proposed formation of a bank, CFS International PLC, master trust arrangements, and legislative assistance. In addition to disclosing information in its possession, under the Proposed Protective Order, CFS would not object, on the basis of privilege, to the production and disclosure of the defined privileged information that is in the possession of others.

**6.** On or about October 15, 1998, CFS's current bankruptcy counsel, Jenner & Block, was contacted and employed by CFS to investigate the allegations contained in the renowned "Anonymous Letter." The Anonymous Letter is *alleged* to have alleged "certain improprieties relating to (a) the sale of assets by CFS,

matters to the extent communications occurred or documents were created after October 15, 1998. For example, CFS is unwilling to waive privileges with respect to pre-October 15th communications relating to the securitization transactions or to the resignation of certain executive employees be deemed a subject matter waiver of its privileges with respect to legal advice given to CFS on these matters on or after October 15, 1998.[7] Nor does CFS intend to waive privileges that relate to current litigation, regardless of when the advice was given or work product created, or that relate to advice given and work product created in connection with these bankruptcy proceedings. CFS contends that its voluntary waiver of its attorney-client privilege as to matters of relevance to parties in interest, a gesture intended to promote efficiency and to provide creditors with more information than they otherwise are entitled to, should not be used against CFS to the detriment of its current attorney-client relationships and strategies in pending or future litigation. Finally, CFS does not intend to waive privileges in connection with matters that are not at issue in this bankruptcy case or in the District Court Litigation—for example, *routine* prepetition employment matters or tax audits.

In order to protect the privileges that CFS does not intend to waive while providing substantial relevant but otherwise privileged information to interested parties, CFS requests that the Court enter the Protective Order No. 2 Governing Limited Waiver of Privileges by Commercial Financial Services, Inc. attached to CFS's Motion. The Proposed Protective Order would require any party desiring to gain

(b) the maintenance and reporting of information by CFS, and (c) certain payments made by CFS to departing employees." Motion for Protective Order, p. 1, ¶ 3. The Court has not been provided a copy of the letter, but parties in interest have never disputed that general characterization of the Anonymous Letter.

The Court finds that the October 15, 1998, date is significant in this case, since independent investigating counsel was brought in and new management was installed soon thereafter. The effect was somewhat similar to the "cleavage" that occurs when a chapter 11 bankruptcy is filed; at that point attention palpably shifted toward the survival of the entity, with active participation of creditors, and away from the self-interest of the shareholders and prepetition management.

Because Jenner & Block was retained by CFS to investigate a crisis that arose prior to its retention in this case, communications made to and work product generated by Jenner & Block prior to and after the filing of these bankruptcy cases stands remote from the activities that precipitated the crisis and that are of legitimate interest to creditors. Thus, seeking to protect the integrated whole of Jenner & Block's representation from intrusion is not inconsistent with CFS's duties to creditors.

7. CFS does *not* intend to waive privileges in matters relating to (a) legal services provided to CFS by in-house or outside counsel on or after October 15, 1998, (2) the representation of CFS in current litigation or litigation that may be commenced hereafter, (3) the representation of CFS in connection with tax audits; or (4) any other matters not expressly included in the definition of disclosed information set forth in Exhibit A of the Proposed Protective Order. CFS does *not* intend to waive privileges in connection with the representation of CFS by Jenner & Block (except for a limited waiver in connection with the Jenner & Block Report) or Tomlins & Goins, and, except as otherwise specifically waived, privileges in connection with its representation by Mayer, Brown & Platt and Doerner, Saunders, Daniel & Anderson. *See* Exhibit A to Proposed Protective Order.

Further, in response to objections that CFS was not specific enough in describing the *matters* in which it was not waiving privileges, CFS has listed and described all subject matters contained in Mayer, Brown & Platt files it does *not* intend to produce at this time. *See* Exhibit 2 to CFS's Response. These include, generally, defending lawsuits against CFS or its affiliates commenced by account debtors under FDCPA or various other theories, a tax audit, an attempted workout, and miscellaneous issues. With respect to the "Miscellaneous" file listed on Exhibit 2, CFS has represented that it intends to waive privileges as to documents in that file that relate to subject matters that it otherwise intends to disclose, *i.e.*, the securitization matters and the executive resignation matters and that those documents will be placed in the CFS Depository. As of the date of the hearing, CFS had not yet reviewed the "Miscellaneous" file.

access to the CFS Depository, which would contain both the privileged documents to which the privilege is waived (including privileged documents produced by others) and responsive unprivileged documents, to execute a Non-waiver Agreement in which the party agrees that the party will not argue in any forum that CFS's waiver of its privileges with respect to the disclosed privileged information resulted in a "subject matter waiver" of any privilege, protection, or immunity as to any withheld document. CFS's Proposed Protective Order also provides that the proposed disclosures will not result in subject matter waiver as a matter of law.

The objecting parties contend that without a full review of the documents by CFS for privileges *prior* to releasing the documents, there will be no privilege log from which the objecting parties may know what documents were withheld, and that they will be precluded from testing the validity of CFS's claimed privileges in undisclosed documents. CFS is not seeking a ruling on the validity of any waived or unwaived privilege at this time, however.[8] CFS intends to provide a privilege log of all responsive documents that it withholds from production. Thus, objections to CFS's claimed privileges will be handled in the ordinary course according to ordinary procedures, including an *in camera* review of documents, if warranted. Further, CFS envisions that production and disclosure will be an on-going process. CFS's cur-

rent offer to waive privileges as to certain information will not preclude CFS from waiving privileges as to other matters if, in the view of CFS, these matters become important to creditors in evaluating their claims for plan negotiation purposes.[9]

The objecting parties generally also object to the entry of the Proposed Protective Order to the extent that it purports to preclude them from objecting to any asserted privilege in undisclosed documents on the grounds of subject matter waiver. CFS, however, states that it intends to disclose *all information* falling within the subject matter description of disclosed privileged information except for privileged information specifically *carved out* of the waiver (for example, post-October 15th communications to counsel and work product), and except where a privilege other than attorney-client or work product applies. Again, the withheld documents will be listed on a privilege log so that parties will be able to judge for themselves what CFS is withholding.[10]

The objecting parties also argue that it is unfair to condition access to all documents in the CFS Depository, including unprivileged documents, upon agreement to the terms of the Proposed Protective Order. CFS points out that once an Interested Party (that is, a party who has opted to participate in Rule 2004 discovery pursuant to the Rule 2004 Order) requests copying of any documents contained in the CFS Depository, such documents may be

---

8. CFS has agreed to revise the Proposed Protective Order to add the following new paragraph:

 This Order does not constitute the consent or agreement of parties in interest that the Disclosed Privileged Information is subject to a valid attorney-client privilege, work product privilege, or any other applicable statutory or common law privilege and is without prejudice to the right of a party in interest to object to the Debtors' assertion of attorney-client privilege, work product immunity or any other applicable statutory or common law privilege with respect to Undisclosed Privileged Information.

9. Mr. Caruso testified that CFS also intended to waive privileges in connection with infor-

mation about asset sales occurring prior to the circulation of the Anonymous Letter, the formation of DIMAT, and other matters not specifically listed on Exhibit A to the Proposed Protective Order, to the extent necessary to give the parties information regarding the alleged fraud. Indeed, CFS states that it intends to disclose "virtually everything that would be of interest to the ABS Bondholders, the Unsecured Creditors and other interested parties in connection with these bankruptcy proceedings." CFS's Response at p. 6.

10. CFS intends to list all withheld responsive documents in a privilege log. Thus, an objecting party could challenge the assertion of the privilege, but not on the ground of subject matter waiver.

available to all Interested Parties through the IKON Depository established in the Rule 2004 Order. Interested Parties with access to the CFS Depository may request that CFS Depository documents be imaged by IKON and made available on CD–ROM or other suitable media. *See* Rule 2004 Order, p. 7, ¶ F(iii). Other Interested Parties may then obtain copies of the CD–ROM disk or other suitable formatted copy. *Id.* Also, Interested Parties with access to the CFS Depository may obtain paper copies of documents in the CFS Depository which, except for the Jenner & Block Report,[11] they could share with other Interested Parties, either voluntarily or in response to a discovery request. *See* Rule 2004 Order, p. 7, ¶ F(v).

The objecting parties also object the jurisdictional provisions of the Proposed Protective Order, specifically (a) the proposed finding that this Court has exclusive jurisdiction over any challenge to a claim of privilege made by CFS, (b) the requirement that a party desiring access to the CFS Depository consent to this Court's jurisdiction in all matters relating to the Proposed Protective Order, and (c) the reservation of jurisdiction by this Court to enforce the Order notwithstanding the termination of CFS's and CF SPC/NGU, Inc.'s Chapter 11 cases. *See* Proposed Protective Order, p. 3, ¶ 11; p. 10, ¶ V(c); and p. 11, ¶ X. CFS contends that this Court has exclusive jurisdiction over property of the estate, including CFS's privileges.

Finally, the objecting parties object to the conclusions of law set forth in the Proposed Protective Order, claiming that authorities supporting contrary conclusions exist. CFS admits as much, but contends that since no controlling authority exists, the Court is free to adopt CFS's suggested conclusions.

### 5. The Jenner & Block Report

Notwithstanding that CFS does not otherwise intend to disclose privileged communications occurring post-October 15, 1998, CFS does propose to release the so-called Jenner & Block Report (the "Report") that was prepared on or near the date CFS filed its Petition herein, in its current draft form, which CFS contends is a privileged document.[12] CFS requests that parties who desire to obtain a copy of the Report be required to execute a Non-waiver Agreement, in which the recipient agrees to keep the Report confidential pursuant to the terms of Protective Order No. 1,[13] and agrees that the recipient will not argue in any forum that the waiver of privilege by CFS with respect to the Report resulted in a "subject matter waiver" of any privilege, protection or immunity CFS otherwise has in information underlying the Report.

With respect to the Jenner & Block Report, the objecting parties argue that they should be able to test the accuracy of the Report by having access to source material used in preparation of the Report. They also contend that CFS or others may use the Report in nefarious ways, *i.e.*, as a "sword" in litigation, and unless the objecting parties are allowed to assert subject matter waiver, parties against whom the

---

**11.** Recipients of the Jenner & Block Report may not distribute it to others unless the subsequent recipient executes agreements to be bound by the two protective orders and the Non–Waiver Agreement. *See* discussion of Jenner & Block Report, *infra* pp. 841–42.

**12.** CFS does not seek a ruling at this time as to whether any document it proposes to produce or withhold is actually privileged.

**13.** An Agreed Protective Order was entered in this case on February 1, 1999, which governed the distribution and confidentiality of

the PricewaterhouseCoopers Report ("Protective Order No. 1"). Mr. Caruso estimated that up to 150 individuals have obtained the PWC Report in compliance with Protective Order No. 1. The active parties in interest are familiar with the procedure and duties imposed by Protective Order No. 1; thus to the extent that confidentiality of the Jenner & Block Report is warranted, the Court agrees that incorporating the terms of Protective Order No. 1 into Proposed Protective Order is an efficient method of accomplishing that goal.

Report is used will be precluded from obtaining the information needed to attack the veracity of the Report. CFS argues that the Report is hearsay and thus is not admissible evidence, and that CFS is not using, and does not intend to use, the Report to obtain a tactical advantage.

### Conclusions of Law

#### 1. Authority to enter protective order

■ This discovery matter is a contested matter governed by Bankruptcy Rule 9014. Rule 9014 renders Bankruptcy Rule 7026(c), which sets forth grounds for the entry of a protective order, applicable in contested matters. Notwithstanding that the discovery sought in this proceeding was initiated under Bankruptcy Rule 2004 rather than Bankruptcy Rules 7026–37, Rule 2004 refers to Bankruptcy Rule 9016, which makes Rule 45 of the Federal Rules of Civil Procedure applicable in bankruptcy cases. Rule 45 permits an entity from which discovery is sought to seek protection from the Court if the discovery requests require disclosure of privileged information, or if they are unduly burdensome or costly. Moreover, this Court's Rule 2004 Order expressly contemplates that a recipient of discovery requests may seek a protective order. *See* Rule 2004 Order, p. 5, ¶ B. The Court concludes that the basic principles of Bankruptcy Rule 7026(c) should be considered in determining whether a protective order is appropriate in connection with Rule 2004 discovery.[14]

#### 2. Exclusive jurisdiction over property of the estate and continuing jurisdiction to enforce orders

"The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e). "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). In this district, all cases under title 11 have been referred to the bankruptcy judges. *See* United States District Court for the Northern District of Oklahoma: Miscellaneous Order No. M–128 dated July 10, 1984 ("Order of Referral of Bankruptcy Cases") and Miscellaneous Order No. M–128 dated April 11, 1985 ("District Court Rules for Bankruptcy Practice and Procedure"), Rule B–5 ("Clarification of General Reference to Bankruptcy Judges"), as amended.

■ These bankruptcy cases were automatically referred to this Court under the above orders of referral. The District Court has not withdrawn any part of these cases. Thus, this Court has exclusive jurisdiction over all property owned by the debtors at the commencement of these cases and all property of the estate. The estate "is compromised of all of the following property wherever located and by whomever held: (1) ... all legal and equitable interests of the debtor in property as of the commencement of the case ... [and][a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a).

CFS contends that its privileges are property of the estate over which this Court has exclusive jurisdiction. Corpo-

---

**14.** The Court acknowledges that certain discovery requests that are objectionable in adversary proceedings or contested matters under Bankruptcy Rules 7026–37 are not objectionable in Rule 2004 discovery (the scope of discovery is broader under Rule 2004, for example), and therefore Rule 7026 is not applicable to all issues that arise in discovery under Rule 2004. But the Court has authority in Rule 2004 discovery to make orders as justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense; these are the principles articulated in Rule 26(c) of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Bankruptcy Rule 7026. *See, e.g., In re RFD, Inc.,* 211 B.R. 403 (Bankr. D.Kan.1997); *In the Matter of M4 Enterprises, Inc.,* 190 B.R. 471 (Bankr.N.D.Ga.1995).

rate privileges have been recognized, both prior to and since the enactment of the Bankruptcy Code of 1978, as passing to, vesting in, and exercisable by the trustee or debtor in possession in bankruptcy. *See e.g., CFTC v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (power to exercise privileges vests in trustee of corporate debtor); *Citibank v. Andros*, 666 F.2d 1192, 1195–96 (8th Cir.1981) (same); *In re O.P.M. Leasing Services, Inc.*, 13 B.R. 64 (S.D.N.Y.1981) (corporation's privileges pass by operation of law to trustee in bankruptcy). In determining who had the right to exercise privileges, these courts did not analyze Section 541(a), nor did they refer to privileges as property of the estate. Rather, in these cases, privileges were presented as "powers" that, in bankruptcy, are passed to the person(s) most analogous to corporate management, *i.e.*, the trustee or, in the case of a debtor in possession, the designated representative.[15]

■ Information and documents possessed by a corporate debtor, and intangible rights related to corporate information and documents, *are* property of a corporate debtor's estate, however. *See* 11 U.S.C. § 541(a). This Court has exclusive jurisdiction over such property.[16]

■ To the extent a party to the District Court Litigation or any other outside litigation seeks information and documents from CFS, the party must request, in this Court, relief from the automatic stay. *See* 11 U.S.C. § 362(a)(1) and (3). In the process of obtaining relief from the stay, CFS may lodge its objections to such

relief, and such relief may be conditioned upon compliance with any orders issued by this Court, including an appropriate protective order. In the case of *AM International Inc. v. Datacard Corp.*, 106 F.3d 1342 (7th Cir.1997), the parties disputed the jurisdiction of the district court to hear and decide a dispute that was exclusively within the referred jurisdiction of the bankruptcy court. The Court of Appeals wrote:

> We find that the district court lacked jurisdiction to hear this claim.... The Delaware bankruptcy court's order lifting the stay in that case gave AMI and Datacard the green light to litigate their Illinois claims. The order also provided that neither party could execute any judgment obtained in the Illinois case without an order from the Delaware bankruptcy court. Additionally, in both its order confirming AMI's reorganization plan and the plan itself, the Delaware bankruptcy court stated that it retained "exclusive jurisdiction" to "determine any and all objections to the allowance of Claims." The plain language of the order and the plan couldn't be clearer. The bankruptcy court authorized the Illinois district court to settle liability issues but remained the sole authority on bankruptcy issues such as the allowance of claims.

*Id.* at 1352. This Court's control over property of the estate may limit the scope of CFS's participation in discovery in outside litigation such as the District Court Litigation. This Court has a duty to protect the integrity of the bankruptcy pro-

---

**15.** This is not to say that a chapter 11 debtor's privileges are *not* property of the estate, only that none of the cited cases address the issue.

**16.** *Patterson v. Williamson*, 153 B.R. 32 (E.D.Va.1993), cited by the Aegon Group, is inapposite. There the district court, acting as an appellate court, found that the bankruptcy court's rulings on discovery matters in a non-core proceeding were null and void because the non-core proceeding had previously been *withdrawn* from the bankruptcy court to the district court, and the bankruptcy court therefore *lost* jurisdiction over the non-core pro-

ceeding. That is not the case here. CFS is not a party to the District Court litigation, and the District Court has not withdrawn this case. This Court retains jurisdiction over property of the estate unless and until the District Court withdraws the bankruptcy case. Withdrawal of the bankruptcy case would not have any effect upon the District Court Litigation, however, because this case would still be a bankruptcy case, subject to the Bankruptcy Code, Bankruptcy Rules and bankruptcy policies, and the District Court Litigation would still be civil litigation in which CFS is not a party.

cess, notwithstanding that such protection might impose some restrictions or conditions on a District Court litigant's discovery. Such is the nature of bankruptcy. Orders that promote efficiency and diminish expense that may not be justifiable in proceedings outside of bankruptcy are *encouraged* by bankruptcy law and policy.[17]

Parties to the District Court Litigation who are Interested Parties in this case may also choose to obtain documents and information from CFS through the process established by the Rule 2004 Order. Again, participation in Rule 2004 discovery will be subject to any appropriate protective order entered by this Court in connection herewith.

 Finally, bankruptcy courts retain jurisdiction over certain matters after dismissal or closing of a bankruptcy case. *See, e.g., Menk v. Lapaglia (In re Menk),* 241 B.R. 896, 905–07 (9th Cir. BAP 1999). Courts inherently have the power to enforce their own orders, regardless of whether a case is open or closed. *See Menk,* 241 B.R. at 906 (9th Cir. BAP 1999) ("The bankruptcy court retains subject matter jurisdiction to interpret orders entered prior to dismissal") (*citing Beneficial Trust Deeds v. Franklin (In re Franklin),* 802 F.2d 324, 326–27 (9th Cir.1986); *Koehler v. Grant,* 213 B.R. 567, 569 (8th Cir. BAP 1997)); *cf. Chambers v. NASCO Inc.,* 501 U.S. 32, 43–44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (confirming that jurisdiction extends to exercising certain inherent powers of federal courts, including

the power of a court to enforce its own lawful orders). A protective order that concerns the preservation of privileges and confidentiality endures beyond the closing of a case,[18] and thus the court that enters an order retains jurisdiction to enforce it, and other courts cannot disregard it. *See e.g., Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 781–82 (1st Cir.1988); *State of Florida v. Jones Chemicals, Inc.,* 1993 WL 388645, *2–3 (M.D.Fla.1993)(because protective order imposed obligations that survived the termination of the action, the court retained jurisdiction to enforce it); *see also, Katchen v. Landy,* 382 U.S. 323, 334, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) ("The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts.")

The Court concludes that (a) it has exclusive jurisdiction over property of the estate, including information and documents possessed or controlled by the estate, and intangible rights related thereto, (b) requests for discovery from CFS must proceed through this Court, (c) this order governing CFS's privileges will survive the closing or dismissal of this bankruptcy case, and (d) the Court retains jurisdiction to enforce or modify this order as justice requires.

### 3. General principles of waiver

 Because CFS's motion arises in a bankruptcy proceeding, the principles of privileges and waiver of privileges must be

---

17. *See e.g., Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), wherein the Supreme Court delineates the historical structure and purpose of bankruptcy laws, stating "special attention [is given] to the subject of making (the bankruptcy laws) inexpensive in (their) administration," with the "chief purpose of the bankruptcy laws [ ] to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period ... and that provision for summary disposition, without regard to usual .modes of trial attended by some necessary delay, is one of the means chosen by Congress to effectuate that purpose." *Id.* at 328–29, 86 S.Ct. at 472 (internal quotes and citations omitted).

18. A protective order is analogous to a permanent injunction; the need to protect certain information does not necessarily evaporate upon the closing of the bankruptcy case. A court has the power to enforce its own order at any point while the order is in effect, including after a case has been terminated. *See Public Citizen v. Liggett Group Inc.,* 858 F.2d 775, 782 (1st Cir.1988). "Correlative with this power to enforce, the district court necessarily also retained power to modify the protective order in light of changed circumstances." *Id.*

construed in tandem with the rights and duties of the debtor in possession, as a trustee or fiduciary, and the rights and duties of the constituents of the estate. A debtor in possession has an obligation to perform duties enumerated in Sections 704, 1106, and 1107 of the Bankruptcy Code. The debtor in possession has a duty to creditors to provide relevant information regarding the affairs of the estate upon request. The debtor in possession also has a duty to contest claims and to preserve and maximize the estate, which places the debtor in possession in an adversarial relationship with certain creditors.

▮ In performing these often conflicting duties, a debtor in possession is entitled to competent legal representation. *See, e.g.,* 11 U.S.C. § 327–31, 1107. Such representation can only be effective if attorney-client confidences and attorney work product is protected from intrusion. In seeking this protective order, CFS, as debtor in possession, seeks to preserve the sanctity of its current relationships with counsel, that is Jenner & Block, Tomlins and Goins, the Law Offices of Jay Geller, and special counsel, Doerner Saunders Daniel & Anderson, and to withhold from its present litigation adversaries information that is protected by privileges.[19]

However, CFS and the objecting parties agree that a waiver of the protections of the attorney-client privilege and work product doctrine with respect to the prepetition debtor's conduct and financial affairs is appropriate. Sections 704 and 1106 of the Bankruptcy Code impose duties upon a debtor in possession to furnish information concerning the estate as is requested by parties in interest (subject to the assertion of legitimate privileges), and to file a plan as soon as practicable. CFS's proposed partial waiver would place vital information in the hands of creditors sooner rather than later. While this information is needed by the creditors to evaluate their claims, disclosure of information about the legal advice received by CFS, as debtor in possession, on these issues is not warranted. In a bankruptcy case, which is unlike typical adversarial civil litigation, a mechanism to accomplish both worthy aspirations should be obtainable. CFS's Proposed Protective Order attempts to balance the competing duties and interests. In the context of this complex document-intensive case, the structure and effect of the Proposed Protective Order is not inconsistent with the policies undergirding privilege law.

▮ The purposes of the attorney-client privilege are (1) to encourage clients to communicate candidly and in confidence with their attorneys in order to obtain legal advice and (2) to foster the mutual loyalty and trust between attorney and client that is fundamental to the success of the adversarial process. *See Swidler & Berlin v. United States,* 524 U.S. 399, 403, 118 S.Ct. 2081, 2084, 141 L.Ed.2d 379 (1998); *United States v. Upjohn Co.,* 600 F.2d 1223, 1225–26 (6th Cir.1979), *rev'd on other grounds, Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Because disclosure of a privileged communication to a third party is inconsistent with the notion of confidentiality, such disclosure is deemed to waive the privilege as to the communication itself. *See In re Grand Jury Proceed-*

---

19. It is particularly noteworthy that CFS, as debtor in possession, is controlled by Mr. Caruso as president and sole director. Prior to October 1998, CFS was controlled by its stockholders who are now defendants in the District Court Litigation, namely William Bartmann, Kathryn Bartmann and Jay Jones, and their affiliated trusts. In October 1998, as a result of the circulation of the Anonymous Letter, the Bartmanns and Mr. Jones resigned as officers and directors. Mr. Caruso was brought in as a crisis manager in November 1998 and became president of CFS on December 11, 1998, the day that CFS filed its chapter 11 petition. Mr. Caruso's involvement in this case is more analogous to that of a trustee than a representative of a traditional debtor in possession because of the absence of self interest or financial interest in the debtor. Mr. Caruso is therefore in a position to make truly disinterested decisions regarding the waiver of privileges in connection the securitizations and other financial affairs of the prepetition debtor.

*ings,* 78 F.3d 251, 254 (6th Cir.1996).[20] An important distinction must be made between the policy behind finding waiver of a privilege in a specific document or communication by disclosure to a third party, which is that a secret divulged is no longer a secret, and the policy behind finding a waiver of privilege in all documents or information relating to the same subject matter. The policy underlying the subject matter waiver doctrine is one of fairness.[21] The stark contrast of these two policies is clearly illustrated in the *Grand Jury Proceedings* case, *supra.*[22] *See also Iron Workers Local No. 17 Ins. Fund v. Philip Morris, Inc.,* 35 F.Supp.2d 582 (N.D.Ohio 1999) (agreement, or failure to properly object, to making documents public on the internet waived privilege in published documents, but not in documents related by subject matter).

 The purpose of the work product doctrine is to uphold "the general policy against invading the privacy of an attorney's course of preparation [which] is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order." *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The range of interests protected by the work product doctrine is broader than the interests served by the attorney-client privilege; in addition to maintaining confidential communications and thus encouraging full client participation in the litigation, the work product doctrine preserves attorneys' interests in their own intellectual creations and processes, and promotes the use of the adversary system to settle disputes that are otherwise irreconcilable. In recognition that attorneys and their work product are "indispensible parts of our administration of justice," the privilege is assertable by the attorney, and is not necessarily waived by disclosure. *See, e.g., Sealed Case,* 676 F.2d at 808 n. 51, 809.[23]

 However, "courts need not allow a claim of privilege when the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege." *Sealed Case,* 676 F.2d at 818. In *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the Supreme Court found that testimonial use of a report of an *agent* of the defense counsel waived any work product privilege

**20.** The attorney-client privilege is absolute, unless an exception or waiver theory applies. Exceptions include the crime-fraud doctrine. Waiver may occur expressly or may be implied from conduct, such as placing attorney-client communications at issue in a case. "Through the doctrines of implied waiver and exception, the law entrusts the courts with a duty to guard that the offices of lawyers, and the respect which we have for the bar, are not used for unfair or corrupt practices." *In re Sealed Case,* 676 F.2d 793, 825 (D.C.Cir. 1982).

**21.** The issue of fairness does not arise until the partial disclosure of privileged information is placed *at issue* in the case by the disclosing party, *i.e.,* the partially disclosed information is used as a "sword." *See, e.g., In re von Bulow,* 828 F.2d 94, 100–03 (2d Cir.1987) (publication of privileged conversations between attorney and client in a best selling non-fiction book did not waive the attorney-client privilege as to undisclosed communications relating to the same subject matter because the client had not disclosed the information to obtain an advantage in pending litigation).

**22.** There, the Court of Appeals affirmed the District Court's finding that in communicating to government investigators that their attorney advised them that two parts of a twenty-four part marketing plan were illegal and two other parts were not, the clients waived the attorney-client privilege attached to the communications themselves. However, the Court of Appeals reversed the District Court's finding that the communications to the investigators waived the privilege as to the attorney's advice regarding the remainder of the twenty-four part plan under the subject matter waiver doctrine. The Court found that the District Court construed subject matter waiver too broadly. *Id.* at 255–56.

**23.** "To the extent that the interests do not conflict, attorneys should be entitled to claim privilege even if their respective clients have relinquished their claims [of privilege]." *In re Sealed Case,* 676 F.2d at 809 n. 56.

in the agent's underlying materials. *Id.* at 239–40, 95 S.Ct. at 2170–71. Otherwise, the prosecution would have been deprived of the means to effectively cross-examine the witness. Thus, testimonial use by counsel or its agent of factual work product may trigger a limited waiver of the protection of work product's subject matter in order to prevent a one-sided presentation of evidence to a jury.

■ Procedures implementing the work product doctrine are incorporated into Rule 26(b)(3) of the Federal Rules of Civil Procedure, made applicable to these proceedings by Bankruptcy Rule 7026. Generally, ordinary work product may be obtained only upon a showing that "the party seeking the material has a substantial need of the materials in the preparation of the party's case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). If that burden is met, the Court, in ordering discovery of the materials that are work product, "*must* protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney." *Id.* Thus, under Rule 26(b)(3), the protection of mental impressions, conclusions, opinions and legal theories of an attorney is not qualified in the same manner as ordinary work product (which may be discovered upon the requisite showing of need and unavailability), and it appears that so-called "opinion work product" may be accorded absolute protection [24] in the same manner as the attorney-client privi-

lege, subject to the same principles of exceptions and waiver.

■ Exceptions to the absolute nature of the "opinion work product" doctrine include the crime-fraud exception [25] and simple waiver. While the waiver doctrine applies to the particular item of work product that is disclosed (*i.e.*, in litigation, an attorney's mental processes are disclosed in the ordinary course of presenting the client's position), there is no justification for the revelation of all of the attorney's notes, research, and other evidence of the attorney's mental processes or opinions related to subject matter of such disclosure.

### 4. Specific conclusions of law

With these principles in mind, the Court concludes that—

■ A. *Subject matter waiver is narrowly construed.* Disclosure of privileged materials concerning one subject matter does not waive privileges attaching to materials concerning other subject matters. *See United States v. Nobles,* 422 U.S. 225, 240, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141 (1975) (implied waiver, or subject matter waiver, is very narrowly construed).

■ B. *Subject matter waiver applies only where partial waiver confers a tactical advantage.* Although under some circumstances disclosure of privileged communications between a client and an attorney may waive privileges with respect to other communications concerning the same matter, courts have discretion [26] not to ap-

---

**24.** The United States Supreme Court has never reached this precise issue. In *Upjohn Co. v. United States,* the Supreme Court stated "[w]hile we are not prepared at this juncture to say that [opinion work product] is always protected by the work-product rule, we think a far stronger showing of necessity and unavailability by other means than was made by the Government or applied by the Magistrate in this case would be necessary to compel disclosure." 449 U.S. at 401–02, 101 S.Ct. at 688–89. The Circuit Court in *In re Sealed Case* stated that the appellant·had not attempted to show "extraordinary" necessity in order to obtain disclosure of opinion work product, and further stated that the opinion

work product privilege is "for all practical purposes, as absolute as the attorney-client privilege," but extends to a larger class of materials. 676 F.2d at 811–12.

**25.** "The crime-fraud exception presents one of the rare and extraordinary circumstances in which opinion work product is discoverable." *Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1422 (11th Cir.1994).

**26.** In this bankruptcy context, where there is no controlling federal common law as to subject matter waiver of privileges possessed by

ply the subject matter waiver doctrine where the disclosure is not made in order to secure a tactical advantage. *See In re Sealed Case,* 676 F.2d 793, 809 n. 54 (D.C.Cir.1982) (*citing Weil v. Investment/Indicators, Research & Management, Inc.,* 647 F.2d 18, 25 (9th Cir.1981)).

 The doctrine of subject matter waiver is narrowly construed and should only be employed when unfairness (*i.e.,* tactical or strategic advantage) is implicated-otherwise, the doctrine of subject matter waiver serves no useful purpose. *See, e.g., United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) (*citing In re Sealed Case,* 676 F.2d at 818); *Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 156 (D.Del. 1977) ("the privilege or immunity has been found to be waived only if facts relevant to a particular, narrow subject matter have been disclosed in circumstances in which it would be unfair to deny the other party an opportunity to discover other relevant facts with respect to that subject matter."). *See also Iron Workers Local No. 17 Ins. Fund v. Philip Morris, Inc.,* 35 F.Supp.2d 582, 597 (N.D.Ohio 1999) (agreement, or failure to properly object, to making documents public waived privileges in the published documents themselves, but not in documents related by subject matter because there was no evidence that disclosure of the documents resulted in an unfair litigation advantage); *Bramlette v. Hyundai Motor Co.,* 1993 WL 338980 at *3 and

n. 6 (N.D.Ill.1993)(disclosure of some documentary work product does not destroy protection of work product of the same character unless the litigant uses the work product in a significant way while shielding related relevant work product); *cf. Frontier Refining, Inc. v. Gorman–Rupp Co.,* 136 F.3d 695, 704 (10th Cir.1998) ("a litigant cannot use the work product doctrine both as a sword and shield by selectively using the privileged documents to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion"); *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel,* 666 F.Supp. 1148, 1153 (N.D.Ill.1987) (one purpose of subject matter waiver is to prevent exploitation of selective disclosures for tactical advantage).[27] *But see Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 485 (S.D.N.Y.1993) (concludes that *New York* law would find that a waiver of privileges as to some communications acts as an implied waiver as to all such communications concerning subject matter even if no tactical advantage is sought).

 No one contends that it is not in the best interests of the estate that CFS be permitted to disclose certain otherwise privileged information in order to foster dialogue in furtherance of a consensual plan while preserving privileges related to their current attorney-client relationships and litigation. To the extent that the

---

the estate and its counsel, the Court may interpret the privileges and waiver doctrines "in light of reason and experience." *See* Fed. R.Evid. 501, made applicable to these proceedings by Bankruptcy Rule 9017.

**27.** The Court has reviewed the cases cited by Chase espousing the view that partial disclosure of privileged information is *per se* beneficial to the disclosing party-believing that otherwise the party would not have made the disclosure—and therefore no determination of tactical advantage need be performed. The Court disagrees with the premise that "partial disclosure always creates the possibility of abuse" and that "[w]henever a party discloses information which it could have withheld on the basis of privilege, an implicit determination of benefit has been made by the party."

Memorandum of Chase, p. 5, *quoting Bramlette v. Hyundai Motor Co.,* 1993 WL 338980 at *2 (N.D.Ill.1993), and citing a line of cases from the Northern District of Illinois which are distinguishable on their facts. In a bankruptcy case, where a debtor in possession is acting as a fiduciary for the benefit of constituents of the estate, benefit or tactical advantage to the debtor in possession cannot be implied or presumed.

Moreover, the *Bramlette* court ultimately found that disclosure of some work product to the opponent "did not destroy work product protection for other documents of the same character." *Bramlette,* 1993 WL 338980, at * 3. Thus, *Bramlette* supports CFS's position on the limited nature of subject matter waiver, notwithstanding the passage quoted by Chase.

Committees and individual creditors lack information about the securitization transactions, the asset sales to DIMAT, the stock sales to William Bartmann, the resignation of and severance pay to certain executives, and the identity and motivations of the actors in these matters, the Committees and creditors cannot rationally or realistically evaluate the strengths or weaknesses of their respective claims against the estate. Such information may also bear on the parties' positions in the pending subordination and constructive trust adversary proceedings, the resolution of which are crucial to the formulation of a plan. Informed evaluation is essential to compromise.

It is significant to the issue of "tactical advantage" that CFS does not have a financial interest in either the subordination or constructive trust proceedings. CFS is constrained to distribute the estate according to the priorities established by the Bankruptcy Code. Consistent with its fiduciary duties, CFS seeks to arrive at a distribution plan at the earliest possible time so that snowballing administrative expenses do not consume the estate. The Court concludes that CFS's limited waiver offer is made in good faith and that the limitations it seeks on the effect of its carefully controlled waiver are designed to protect CFS's legitimate interests in preserving as inviolate the confidences of its current attorney-client relationships, as well as preserving privileges in matters that are not within the scope of the creditors' interest in the alleged fraud. The Court concludes that CFS is not attempting to use the privileged information as a "sword" or for any tactical advantage which might require the disclosure of other related privileged information.[28]

Nothing in the Proposed Protective Order prevents an interested party from *challenging the admissibility of evidence* in the event that CFS attempts to use privileged information offensively, however. As to Chase's concern that third parties may use the privileged information offensively against Chase, nothing in the Proposed Protective Order prevents Chase from challenging the admissibility of that evidence in light of the limitations under which the evidence was obtained.[29] Further, nothing in the Proposed Protective Order prevents parties from returning to this Court to seek to modify the protective order, although such modification may be made only in the most extraordinary circumstances because parties protected will have already relied upon its continued application. *See Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir. 1988); *cf. In re Apex Oil Co.*, 101 B.R. 92, 103–04 (Bankr.E.D.Mo.1989)(*citing FDIC v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir.1982), *citing Martindell v. IT & T*, 594 F.2d 291, 296 (2d Cir.1979)) (in the context

28. The Court notes that disclosure made in the furtherance of settlement negotiations generally does not constitute waiver of all privileged information relating to the same subject matter. *See, e.g., Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 46 (D.Md. 1974) (waiver is limited to information actually disclosed during negotiations). While CFS's proposed disclosures are not limited to the closed circuit of settlement negotiations, CFS's motivation in making the disclosures is more analogous to a facilitator of settlement than to a party seeking a tactical advantage in litigation.

29. Chase objects to the release of privileged information because it will benefit some creditors over others. Memorandum of Chase, p. 6. There is no evidence to that effect. Mr. Caruso stated that "there may be information

within … these records that either help or are disadvantageous to each side's respective position. I don't know. All that I know is the more information, the better." Transcript of Hearing of January 25, 2000, p. 46. Further, "one specific thing that I think would be helpful is the Jenner and Block report. . . . [P]eople don't know what's in it. . . . I think they [the ABS holders] would have a hard time agreeing to a settlement without the knowledge of that report. That report may or may not be helpful to their position but I think just the fact of not knowing would be politically difficult for them to explain their settlement to their respective decisionmakers." *Id.* CFS is not preferring one set of creditors over others. It is merely permitting access to information that creditors need to make reasoned settlement decisions.

850

of a protective order preserving confidentiality).

Finally, if at any point in time the Court concludes that CFS *is using* disclosed privileged information in a manner designed to secure a tactical advantage, additional limited disclosure may be required but only to the extent necessary to remedy unfairness to an adversary.

▪ C. *To the extent that disclosed privileged information contains work-product materials, the doctrine of subject matter waiver does not apply in this case.* Generally, subject matter waiver does *not* extend to materials protected by the *opinion* work product doctrine. *See, e.g., Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1422–23 (11th Cir. 1994) and *United States v. Pollard (In re Martin Marietta Corp.),* 856 F.2d 619, 625–26 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989). *See also Canel v. Lincoln Nat'l Bank,* 179 F.R.D. 224, 226 (N.D.Ill.1998) (relying on Fed.R.Civ.P. 26(b)(3)).[30]

▪ Further, disclosure of *non-opinion* work product (or factual work product) does not command disclosure of other work product on the same subject matter unless such work product is used by the client in a testimonial manner. The United States Supreme Court held—

What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of

these materials, the normal rules of evidence come into play with respect to cross-examination and production of documents.

*United States v. Nobles,* 422 U.S. 225, 240 n. 14, 95 S.Ct. 2160, 2171 n. 14, 45 L.Ed.2d 141 (1975) (in the context of a criminal prosecution).

In *Nobles,* the Supreme Court affirmed a District Court's exercise of discretion to disallow testimonial evidence of the defense counsel's investigator unless the prosecutor was allowed to examine the report from which the investigator testified and to cross-examine the witness thereon. When defense counsel claimed that the investigator's report was attorney work-product, the Court found that any privilege was waived, but only to the extent of the narrow subject matter of the particular testimony offered. *Id.* at 240, 95 S.Ct. at 2171.[31] The Court "merely prevented [defendant] from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights." *Id.* Thus, the scope of the subject matter waiver was extremely limited so that even factual work product was protected *except* to the extent that disclosure was required to prevent an unjust result at trial. *See also Frontier,* 136 F.3d at 704 (litigant cannot rely on an item of factual work product as support of claim or defense and deny opponent the means to challenge it).

▪ Again, the Court finds that CFS is not attempting to use work product in a manner adverse to the purpose of the work product doctrine and is not threatening or attempting to make testimonial use

**30.** The Tenth Circuit Court of Appeals has not been called upon to decide this issue. *See Frontier Refining Inc.,* 136 F.3d at 704 n. 12 (noting a split in authority). The United States Supreme Court has left the issue open. *See Upjohn,* 449 U.S. at 401–02, 101 S.Ct. at 688–89 (declining to decide whether any showing of necessity can overcome opinion work product protection).

**31.** Justice White, while concurring in the result of the case, would have found that the work product rule applies only to pretrial discovery and does not apply once a witness, such as an investigator or an expert, is called to testify at trial.

of work product. If CFS counsel later decides to make testimonial use of factual work product disclosed under this order, this Court reserves jurisdiction to determine the scope of the waiver, if any. Further, opinion work product that CFS and its counsel desire to protect is simply not discoverable under the subject matter waiver doctrine.

In any event, CFS intends to waive privileges with respect to *all* work product on the subject matters of interest to creditors, except for work product of its current counsel and in-house counsel post-October 15, 1998, and except in connection with current litigation and this bankruptcy case. CFS's proposal minimizes the potential for unfairness while legitimately protecting privileges in connection with CFS's relationships with current counsel. The Court finds no unfairness in CFS's proposed disclosure or in its limited reservation of work product claims in the context of this bankruptcy case.

■■■■ D. *Disclosure of matters described in the Proposed Protective Order will not waive privileges with respect to communications with, or work product of, counsel retained in this bankruptcy case.* In certain circumstances, disclosure of communications between a client and one attorney concerning a specific subject matter does not waive privileges that attach to communications between the client and other attorneys concerning the same subject matter. *See, e.g., Bower v. Weisman,* 669 F.Supp. 602 (S.D.N.Y.1987) (applying New York law); *Diotima Shipping Corp. v. Chase, Leavitt & Co.,* 102 F.R.D. 532, 537 (D.Me.1984) (applying Maine law). There are circumstances in which disclosure of discussions with one set of attorneys waives the privilege with respect to the same subject matter in discussions with another set of attorneys, such as when the discussions took place contempo-

raneously or as a part of the same transaction. The operative principle for subject matter waiver, again, is whether a partial disclosure will provide an unfair or skewed representation of facts at issue. Under the circumstances of this case, the *opposing parties* would gain an unfair advantage if disclosure of pre-October 15, 1998 communications between CFS and Mayer, Brown & Platt or Crowe & Dunlevy, for example, destroyed the privileged nature of CFS's post-October 15, 1998 communications about the same matters with its investigating counsel, its bankruptcy counsel or its current litigation counsel. Even the Court in *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 487 (S.D.N.Y.1993), which adopted a very broad interpretation of subject matter waiver, stated that the waiver by voluntary disclosure of certain communications with attorneys about a subject matter in a *previous* case "cannot fairly be read to encompass any communications [about the same subject matter] between [the waiving party] and its trial counsel in this case, or any work-product developed by or for trial counsel for *this* lawsuit." *Id.* (emphasis added). When communications made between a party and prior counsel have been made available, a party should not be found to have waived the benefits of its privileges with current counsel about the same subject matter unless the communications with current counsel are *at issue* in the litigation.[32] At this stage, no communications between CFS and its current counsel are at issue in any litigation. CFS's proposed waiver of privileges as to all communications as to the subject matters designated in the Proposed Protective Order that were made *prior* to October 15, 1998, fairly discloses facts regarding CFS's operations and financial status during the time periods relevant to creditors

---

**32.** Chase cites *von Bulow v. von Bulow,* 114 F.R.D. 71 (S.D.N.Y.1987), for the proposition that publication of conversations between one attorney and his client waived the privilege as to the client's conversations with other attorneys about the same subject matter. The

Second Circuit Court of Appeals overturned the District Court in a mandamus proceeding, rejecting the finding of subject matter waiver. *See In re von Bulow,* 828 F.2d 94 (2d Cir. 1987).

and investors interested in this case and therefore will not operate as a waiver of privileged communications made or work product produced after October 15, 1998.

E. *Disclosure of the Jenner & Block Report will not waive privileged communications made in connection with the investigation or Jenner & Block's work product.* Jenner & Block performed an investigation of the corporate affairs of CFS in connection with the allegations contained in the Anonymous Letter commencing on or about October 19, 1998. Jenner & Block ceased its work on the investigation and the Report when CFS filed bankruptcy. The document at issue is a draft prepared by Jenner & Block in December 1998; it is noted that CFS does not represent the Report as comprehensive or conclusive. Constituents of the estate are naturally curious as to what the investigation unearthed. Each of the creditor factions may believe that the Report manifests "smoking gun" information favorable to their respective positions. Mr. Caruso believes that the release of the Report is a crucial step toward effective negotiations. CFS is willing to waive its privileges as to the Report only, and not as to privileged documents and information related to its subject matter.

 Attorneys employed by a corporation to investigate alleged wrongdoing of the corporation may rely upon the attorney-client privilege and work product doctrine to protect communications and information obtained from employees of the corporate client for the purpose of providing sound legal advice to the corporation. *See generally Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). An investigating lawyer "should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system." *Id.* at 391, 101 S.Ct. 677, *quoting Hickman v. Taylor,* 329 U.S. 495, 511, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947). These privileges do not protect underlying facts, however. An adversary seeking to discover alleged wrongdoing is not precluded from making its *own investigation* of the facts by deposing employees, requesting documents, etc. An adversary may not, however, demand and make use of the fruits of the corporation's attorney's own investigation. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. at 685–86.

 Again, a careful distinction must be made as to the effect of disclosure of privileged matter in differing contexts. Specifically, in connection with internal investigations, whether the disclosure is a "partial disclosure" or a "selective disclosure" determines the effect of the disclosure. A selective disclosure occurs when a party provides privileged material to one party to the exclusion of others. This situation most frequently arises in connection with the voluntary disclosure of privileged material, including reports of internal investigations, underlying materials, and attorney notes to governmental agencies such as the IRS and the Securities and Exchange Commission, or to investigatory bodies such as grand juries, when allegations of corporate wrong-doing are in circulation. A number of courts have held that such disclosures constitute waivers of privileges as to all other third parties. *See e.g., In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir.1993) (voluntary selective disclosure of work product to S.E.C., with whom party was in adversarial relationship, waived privilege in same work product in a later civil proceeding); *Westinghouse Electric Co. v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir. 1991); *In re Martin Marietta Corp.,* 856 F.2d 619 (4th Cir.1988); *In re Sealed Case,* 676 F.2d 793 (D.C.Cir.1982); *Permian Corp. v. United States,* 665 F.2d 1214 (D.C.Cir.1981) (disclosure to S.E.C. waived attorney-client privilege as to third parties, but not work product immunity). *But see United States v. Shyres,* 898 F.2d 647 (8th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990)(corporation's disclosure of internal investigation report to grand jury did not waive attorney-client privilege). Prohibiting selective disclosure merely enforces the *simple*

*waiver doctrine*-once a privileged communication has been voluntarily disclosed, the privilege is lost because disclosure is inconsistent with confidentiality.[33]

■■■ A "partial disclosure" occurs when *certain* privileged communications about a subject matter are disclosed while other privileged information about the subject matter is withheld. *See e.g., Westinghouse*, 951 F.2d at 1423 n. 2. Partial waiver is regulated by the *subject matter waiver doctrine*, which asks what else, in "fairness" under the circumstances, should be disclosed. The policy arguments attached to this doctrine are fully discussed above— the use to which the waiving party makes of the disclosure is key in determining whether further disclosure about the subject matter is required. See also, in the context seeking materials underlying of the disclosure of an investigative report, *United States v. Lipshy*, 492 F.Supp. 35, 44 (N.D.Tex.1979); *In re Grand Jury Subpoena*, 478 F.Supp. 368 (E.D.Wis.1979) (release of report only to S.E.C., IRS and grand jury did not waive protection as to underlying attorney-client communications or attorney work product). In its Motion, CFS proposes a partial waiver—disclosure of the Jenner & Block Report only—rather than a selective waiver.

**33.** This is always true as to attorney-client privilege, but as to work product, simple waiver is limited to disclosures that are likely to fall into an adversary's possession. A protective order or confidentiality agreement may preserve work product immunity, however-er.

**34.** Chase argues that the Court should follow *Granite Partners v. Bear Stearns & Co.*, 184 F.R.D. 49, 52–55 (S.D.N.Y.1999) and *In re Kidder Peabody Sec. Litigation*, 168 F.R.D. 459, 473 (S.D.N.Y.1996) to find that disclosure of the Jenner & Block Report would *per se* waive CFS's privileges as to underlying factual materials that are necessary to evaluate the accuracy and reliability of the Report. In both of those cases, however, the party possessing the privilege made affirmative and offensive use of an investigative report in an adversary setting.

In addition, in *Granite Partners*, the investigation was performed by the bankruptcy trustee with the objectives of "(i) assessing the

■■■ In connection with the attorney-client privileged materials not disclosed, the Court finds again that CFS is not making offensive or tactical use of the Report, and therefore disclosure of the Report will not effect a waiver of related privileged matters. CFS does not seek to assert or prove any evidentiary fact by virtue of the Report.

In connection with work product related by subject matter to the Report, the Court has previously held that disclosure of some opinion work product does not waive the privilege as to other opinion work product concerning the same subject matter. Thus, counsels' interview notes, memos, research, selection and arrangement of documents, investigation strategies, personal recollections, etc., are protected under Rule 26(b)(3) of the Federal Rules of Civil Procedure and disclosure cannot be compelled notwithstanding any purported "subject matter waiver." Further, *Nobles* teaches that factual work product related to the same subject matter is discoverable only if testimonial use of the Report is made by CFS. CFS's disclosure of the Report in this context will not waive privileges that apply to other investigative materials that are privileged or are attorney work product.[34]

validity of various creditors claims and (ii) assessing whether the estates have claims against former management, creditors or other persons." *Granite Partners*, 184 F.R.D. at 52. "The purpose of the Trustee's investigation was to ascertain the reasons behind the Funds' collapse and to report those reasons to the Bankruptcy Court and the public." *Id.* at 53. The report, which was never intended to be confidential, was released with the intention that all parties would *rely* upon its accuracy and upon the considered opinions of the trustee. *Id.* Here CFS does not intend that anyone rely upon the Report as the Report is merely a draft of a prepetition investigation performed for CFS's use. Further, CFS does not intend to use the Report to persuade any party one way or another, but to remove any roadblocks to the commencement of settlement discussions.

In *Kidder Peabody*, the District Court found that the investigative report concerning certain employee defalcation, and the supporting documentation, was not work product be-

To the extent that the District Court Litigation plaintiffs may contend that the underlying materials are important to the prosecution of their causes, the Court concurs with the District Court in *In re Woolworth Corporation Securities Class Action Litigation,* 1996 WL 306576 (S.D.N.Y. 1996), that while plaintiffs may have been using a disclosed internal investigation report as their "roadmap" in litigation against Woolworth, the plaintiffs were not entitled to the product of Woolworth's own investigating counsel's labor. Such an invasion was of the type that the Supreme Court thwarted in *Hickman v. Taylor.*

Finally, because CFS will provide a privilege log with respect to documents withheld from production under the Document Requests, interested parties will be permitted to challenge the legitimacy of the privileges claimed in these materials on any ground other than subject matter waiver.

F. *Inadvertantly disclosed documents will handled on a case-by-case basis.* CFS proposes, and the Court finds, that if CFS inadvertently discloses any undisclosed privileged information, CFS may, in addition to or in lieu of any other relief it may seek, promptly supplement, without leave of Court, its definition of Disclosed Privileged Information in the protective order so as to include the document or information inadvertently produced and other documents or information concerning the same subject matter. In such event, the definition of Disclosed Privileged Information in the protective order shall be deemed to be so supplemented as of the date immediately prior to the date of the inadvertent production.

The Abbey Group recommends that the Court heed *Snap–On Inc. v. Hunter Engineering Co.,* 29 F.Supp.2d 965 (E.D.Wis. 1998), for its denial of a motion for a protective order that sought a blanket ruling by the court that any inadvertent disclosure of privileged material would not constitute a waiver of the privilege as to the document. The posture of *Snap–On* is distinguishable from this case, however.

An inadvertent disclosure is an isolated event, the effect of which may be analyzed at the time it is brought to the attention of the Court under various balancing tests that are fact specific. CFS does not seek a ruling at this time that any future inadvertent disclosure will *not* waive the privilege as to the document, as was the case in *Snap–On.* Indeed, CFS suggests that inadvertently produced documents may be added to the list of Disclosed Privileged Information and that CFS will produce other documents concerning the same subject matter, subject to the carve-outs addressed herein, *i.e.,* no waiver as to post-October 15, 1998 documents. If CFS desires to preserve a privilege in a document inadvertently disclosed, CFS may bring the matter to the attention of the Court, in which case the Court will have before it a specific document and set of circumstances under which it may determine whether the privilege in the document should be preserved according to the balancing tests suggested by the Abbey Group, if applicable.

### 5. The proposed disclosure has widespread support from constituents of the estate.

Notice of the Motion for Protective Order was given to all persons on the Master

---

cause the report was created and distributed to the public for the purpose of generating public and shareholder confidence in the company by relating the causes of loss and remedial action taken to prevent future defalcation. Not finding work product protection, there was no reason to address subject matter waiver with respect to work product. *Kidder Peabody,* 168 F.R.D. at 462–63. With respect to the asserted attorney-client privilege, the Court found that Kidder Peabody's offensive

use of and reliance upon the report in litigation, arbitration, and regulatory investigations waived the privilege as to employee interviews embodied in the report. *Id.* at 469. CFS, on the other hand, has strictly maintained confidentiality of the Report; simply releasing its contents without using the contents offensively in a judicial proceeding will, of course, waive the privilege as to the Report itself, but will not effect a subject matter waiver.

Service List, all persons on the Rule 2004 Discovery Service List, all parties who had appeared in the District Court Litigation, all parties known to CFS to have entered into tolling agreements with the official committees or members of the committees, and all governmental and regulatory bodies who are investigating CFS or have expressed an interest in CFS's activities and affairs. Further, Bankers Trust and Norwest, as trustees of the securitization trusts, were to serve notice of the Motion on all ABS holders.

As shown by the objections, only a small fraction of this large group of interested parties has objected to the Motion. A substantial majority of these interested parties do not object to the limitations contained in the Proposed Protective Order. It appears that creditors of this estate are interested in conserving the assets of the estate for distribution rather than requiring CFS and the committees to expend large sums of estate money in Rule 2004 discovery. The Court, too, has duties to insure that the case proceeds efficiently and economically.

The interests of the objecting parties are focused upon the effect of the Proposed Protective Order on the District Court Litigation rather than on this bankruptcy case. The Court recognizes that Chase's posture as a defendant in the District Court Litigation is adverse not only to the estate but also to the asset-backed security holders who have sued Chase. Chase may perceive that the release by CFS of the privileged documents may be helpful to the plaintiffs and detrimental to Chase. To the extent that the information is detrimental, Chase contends that it ought to be able to later argue that all privileged documents about the subject matter should be disclosed because the undisclosed information may reveal that the disclosed information is incorrect or incomplete. Again, admissibility of such information against Chase may be questionable, and nothing prevents Chase from testing any disclosed privileged factual information using conventional discovery techniques (other than obtaining discovery from CFS's current lawyers, who, in any case have no *personal* knowledge of facts arising or events occurring prior to October 15, 1998, and whose opinions or litigation strategies have no evidentiary value in the District Court Litigation). Nothing prevents Chase from deposing members of Mayer, Brown & Platt, for example.

### 6. The Court cannot compel CFS to waive its privileges

■ CFS has determined that *at this time* the risk associated with a waiver of privileges is unacceptable unless privileges with respect to communications with current counsel can be maintained. The Court cannot compel CFS to waive its privileges by balancing the need for information against the harm, if any, to the estate. *See, e.g., Swidler & Berlin v. United States,* 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (rejecting the theory that balancing need of grand jury for privileged information against harm to the person protected by the privilege (who was deceased) should be used to determine that attorney-client privilege should be abrogated after death of the client). The bottom line is whether it is better to allow a conditional release of privileged documents now, while the estate is solvent, or much later, after a complete privilege review of over 8,000 boxes of documents and 8,500 magnetic tapes has been performed and the expense attendant thereto has been incurred.

■ The Court concludes that a protective order consistent with findings and conclusions of this Order is appropriate. If CFS decides, in its capacity as fiduciary, that this Order does not offer acceptable protection and that it cannot accept the risk of waiving privileges without the entry of its Proposed Protective Order, it should so notify the Court and the parties, and the Court will enter an order denying CFS's Motion for Protective Order, and the parties shall proceed with discovery in the ordinary course.

IT IS THEREFORE ORDERED THAT the Motion for Protective Order is granted in part as stated herein; CFS may submit an appropriate proposed protective order similar in form to the Proposed Protective Order, including the amendment proposed by CFS and noted in footnote 8 herein, but consistent with the findings and conclusions contained in this Order; the Court approves and adopts the findings of fact contained in ¶¶ 1–10 and 12–15 of the Proposed Protective Order; the conclusions of law contained in ¶¶ 11 and 16 of the Proposed Protective Order shall be revised to conform to the conclusions expressed in this Order; the Court approves and adopts ¶¶ I–X of the Proposed Protective Order as orders of this Court; the whole of this Order shall be incorporated into the protective order by reference; and the objections of the Chase, the Abbey Group, the Aegon Group, Alliance, Bank Austria and Bank of Scotland are overruled.

The protective order shall also require CFS to distribute privilege logs to Interested Parties (as the term is defined by the Rule 2004 Order) on a monthly basis as documents are reviewed and withheld by CFS.